**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | : | Chapter 13 |
| | : | |
| **MARC A. LAUER** | : | |
| **MARIA A. LAUER,** | : | Bky. No. 10-16500 ELF |
| | : | |
| Debtors. | : | |
| | : | |
| **MARC A. LAUER** | : | |
| **MARIA A. LAUER,** | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | Adv. No. 10-0422 |
| **ST. EDMOND'S FEDERAL SAVINGS BANK,** | : | |
| | : | |
| Defendant. | : | |
| | : | |

# M E M O R A N D U M

## I. INTRODUCTION

Section 506(a) of the Bankruptcy Code provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim.

11 U.S.C. §506(a). Generally speaking, §506(a) allows for the bifurcation of an undersecured claim into a secured claim and an unsecured claim if the unpaid balance of a claim exceeds the value of the property securing the claim.

In Nobelman v. American Savings Bank, 508 U.S. 324 (1993), the Supreme Court held

-1-

that the antimodification clause of 11 U.S.C. §1322(b)(2) prohibits the bifurcation of an undersecured claim under §506(a) if the claim is "secured only by a security interest in real property that is the debtor's principal residence." 11 U.S.C. §1322(b)(2). Nobelman, however, involved an undersecured claim that was partially secured and partially unsecured, not a claim that was entirely unsecured.[1] The Nobelman Court left unresolved the question whether §1322(b) applies to a junior security interest in a debtor's principal residence that is wholly unsecured. In In re McDonald, 205 F.3d 606, 615 (3d Cir. 2000), our Court of Appeals resolved the issue and held that "a wholly unsecured mortgage is not subject to the antimodification clause [set forth] in §1322(b)(2)."

In this adversary proceeding, the Debtors invoke §506(a) and McDonald. Their residence is encumbered by two mortgages held by St. Edmond's Federal Savings Bank ("St. Edmond's"). They contend that the unpaid balance of the first of the two mortgages exceeds the fair market value of their residence and therefore, St. Edmond's' second mortgage is entirely unsecured under 11 U.S.C. §506(a).[2]

As set forth below, I find that the Debtors have not established that the unpaid balance on the senior St. Edmond's mortgage exceeds the value of their residence. Therefore, consistent with Nobelman, St. Edmond's' junior mortgage is protected from modification by 11 U.S.C.

---

[1] A claim is partially unsecured if the value remaining in the collateral after subtracting the balance due on prior liens is less than the unpaid balance of the claim. A claim is wholly unsecured if the unpaid balance of liens senior to the claim exceeds the value of the secured property.

[2] The Debtors do not contend that the second mortgage is secured by anything other than the real property that is their residence. Thus, they implicitly concede that unless the second mortgage claim is wholly unsecured, 11 U.S.C. §1322(b)(2) applies and, under Nobelman, St. Edmond's claim is protected from bifurcation under §506(a).

§1322(b)(2).

## II.  PROCEDURAL HISTORY

Debtors Marc A. Lauer and Maria A. Lauer ("the Debtors") commenced this chapter 13 bankruptcy case on August 2, 2010.  On the same day, they filed a chapter 13 plan which provided for the cure of the prepetition arrears on their residential mortgage held by St. Edmond's.

On November 1, 2010, the Debtors initiated the above adversary proceeding by filing a complaint requesting that the court determine St. Edmond's' second mortgage to be wholly unsecured.  St. Edmond's filed an answer to the complaint denying that the balance due on its senior mortgage exceeds the fair market value of the Debtors' residence.

Trial of this adversary proceeding was held and concluded on March 29, 2011.  Four witnesses testified at trial: (1) Debtor Marc A. Lauer; (2) Melissa Dick, a Vice President of St. Edmond's; (3) Norman A. Rader ("Mr. Rader"), an expert real estate appraiser who testified on behalf of the Debtors; and (4) Frank Di Flumeri ("Mr. Di Flumeri"), an expert real estate appraiser who testified on behalf of St. Edmond's.  The parties introduced a number of exhibits into evidence, including each side's expert appraisal report.  At the conclusion of trial, the parties elected to sum up orally rather than file written post-trial submissions.

### III.  FINDINGS OF FACT

After consideration of the testimony presented at trial and the documentary evidence, I make the following findings of fact:

1.  The Debtors own the residential real estate located at 1828 Shunk Street, in the Girard Estate neighborhood in Philadelphia, PA ("the Property").[3]

2.  The Debtors reside with their two children in the Property.

3.  In 1999, the Debtors purchased the Property for $75,000 when it was in a dilapidated condition.

4.  The Debtors completed renovations of the Property in late 2000.

5.  The renovations included new subfloors, floors, roofing, concrete, mechanical work, drywall, insulation, stone work and tile work.

6.  Since 2000, the Debtors have not done any other work on the Property other than "upkeep."

7.  The Property is subject to two mortgages.

8.  The first mortgage on the Property is held by St. Edmond's ("the First Mortgage") and it secures a note dated January 7, 2005 in the original amount of $280,000.  (Ex. Def-2).

---

[3]  The Girard Estate section of Philadelphia is a ten square block area.  In his report, St. Edmond's appraiser described it as follows:

> Girard Estate is a historic section of the city originally built b[y] Stephen Girard, a wealthy industrialist, to house his employees.  Centered around Girard Estate Park, it is unique to the area in that it offers larger than typical twin style housing  The surrounding are[a] is comprised mostly of smaller row houses.  Regarding South Philadelphia, Girard Estate is generally considered second only to the Packer Park area in terms of desirability.

(Ex. Def-8 at 10).

9. As of the hearing date,[4] the unpaid balance on the First Mortgage was approximately $284,000.00.

10. The second mortgage ("the Second Mortgage") also is held by St. Edmond's and it secures a note dated July 17, 2007, in the original amount of $55,000.00. (Ex. Def-5)

11. As of the hearing date, the unpaid balance on the Second Mortgage was approximately $73,000.00.

12. As of the hearing date, the fair market value of the Property is at least $285,00.00, thereby exceeding the unpaid balance due on the First Mortgage.

### IV. CONCLUSIONS OF LAW

1. St. Edmond's' claim arising from the July 17, 2007 Note and the Second Mortgage is partially secured by the value of its collateral, i.e., the Property.

2. St. Edmond's' claim arising from the July 17, 2007 Note and the Second Mortgage is protected from modification by 11 U.S.C. §1322(b)(2).

3. St. Edmond's' secured claim arising from the July 17, 2007 Note and the Second Mortgage

---

[4] There has been considerable debate regarding the appropriate date for valuing the secured property and determining the unpaid balance due on senior liens in determining whether a secured claim should be bifurcated into secured and unsecured components pursuant to §506(a). Among the options are: (1) date of petition; (2) date of claim determination hearing; and (3) date of chapter 11 or chapter 13 confirmation. See Richard L. Ngo, The Proper Valuation Date of Residential Property for a § 506(a) Lien Strip, 29 Am. Bankr. Inst. J. 14 (Aug. 2010); 134 A.L.R. Fed. 439, Time and Method of Valuation under 11 U.S.C.A. § 506, of Security Held by Creditor of Bankruptcy Estate (West 2011).

The parties in this adversary proceeding have not focused on the proper date to be employed, most likely because they believe that no material changes occurred between the filing of the bankruptcy petition and the hearing (or will occur before the likely future date of the confirmation hearing). For consistency's sake, and without expressing any view on the proper date, I will employ the date of the hearing in analyzing the Debtors' claim.

may not be bifurcated into an allowed secured claim and an allowed unsecured claim pursuant to 11 U.S.C. §506(a).

### V. DISCUSSION

### A.

At bottom, this proceeding is a valuation dispute presented through a "battle of the experts." However, the nature of the legal issue before me requires only a limited resolution of the factual issue regarding the value of the Property that the competing expert witnesses debated. To resolve this adversary proceeding consistent with the court's holding in McDonald, I need only decide whether the value of the Property exceeds $284,000.00, the unpaid balance of the First Mortgage.[5]

The Debtors' expert, Mr. Rader, opined that the fair market value of the Property was $270,000.00 as of September 25, 2010. St. Edmond's' expert, Mr. Di Flumeri, opined that the fair market value of the Property was $380,000.00 as of October 25, 2010.[6]

Both experts are well qualified and experienced appraisers. They agreed that the "comparable sales methodology" is the appropriate approach for valuing the Property and

---

[5] Other valuation disputes arising in a chapter 13 case may require a precise valuation of the property at issue. For example, in a proceeding to determine amount of a partially secured claim not subject to 11 U.S.C. §1322(b)(2) for purposes of determining the confirmability of a chapter 13 plan, it would be necessary to quantify the value of the property in order to calculate the amount of the creditor's allowed secured claim and the amount of post-confirmation interest that must be paid to satisfy the requirement that the debtor's plan pay the creditor the "present value as of the effective date of the plan of the allowed amount of the claim," as is required by 11 U.S.C. §1325(a)(5)(B)(ii).

[6] Neither expert witness suggested that any material change in value occurred between the date of valuation in the fall of 2010 and the March 29, 2011 hearing date.

employed this methodology in reaching their respective conclusions. Both experts chose several recent sales that they considered "comparable" to the Property and made adjustments to those sale prices on account of perceived differences between the comparable property sold and the Property.

While Mr. Rader and Mr. Di Flumeri presented legitimate, competent appraisals, I conclude that they both overstated their case to some degree. In my view, their opinions were at opposite ends of a professionally defensible valuation spectrum – Mr. Rader being at the low end and Mr. Di Flumeri at the high end. Effective cross-examination of counsel by both sides revealed certain weaknesses in each expert's opinion. Ultimately, because the Debtors' had a very small margin of error (i.e., the difference between their contention that the Property's value is $270,000.00 and the $284,000.00 unpaid balance of the First Mortgage), they cannot prevail.

Below, I will not engage in an extended analysis of the strengths and weaknesses of each side's appraisal. Instead, I will identify the issues that convince me that the Debtors' appraisal arrived at a valuation that is at least $15,000.00 too low.

**B.**

The Debtor's appraisal compared the Property to three properties in the neighborhood that had been sold recently:

>   (1) **2528 South 22nd Street** ("the 22nd Street Property"), which was sold for $275,000.00 on February 20, 2010 (see Ex. Def-10);
>
>   (2) **2533 S. Colorado Street** ("the Colorado Street Property"), which was sold for $275,000.00 on August 2, 2010 (see Ex. Def-11); and

(3) **1830 W. Shunk Street**, ("1830 Shunk Street Property"), which was sold for $280,000 on November 30, 2009) (Rader Testimony).

For each of the comparable properties that he chose, Mr. Rader adjusted the Property's value downward because it has one less bedroom and either one or one-half less bathrooms than the comparable properties.[7] He also made certain upward adjustments for other differences. For example, he adjusted the sales prices of the 22nd Street Property and the 1830 Shunk Street Property upward by $1,500.00 because the Property has a rear deck, while those properties do not. He also adjusted the sales price of all three properties upward by $1,500.00 because the Property has central air conditioning and the comparable properties do not.

Mr. Rader arrived at an estimated valuation by comparing the Property to each comparable and then took an average of those three valuations. Those values were as follows:

| Comparable | Comparable Property Sale Price | Comparable Property Sale Price After All Adjustments |
| --- | --- | --- |
| 22nd Street Property | $275,000.00 | $273,000 |
| Colorado Street Property | $275,000.00 | $266,500 |
| 1830 Shunk Street Property | $280,000.00 | $273,000.00 |

By taking an average of the adjusted comparable sales prices, Mr. Rader concluded that the Property is worth $270,000.00, which is less than the actual sales price of each of the comparable properties.

I am unpersuaded .by Mr. Rader's analysis. For three reasons, I find that the Property is worth more than each of the comparable properties.

---

[7]     As discussed below, Mr. Rader's appraisal was incorrect regarding the number of bathrooms in the Property. It has two bathrooms, not just one.

First, Mr. Rader treated all of the properties as having an "average" quality of construction and being in "average" condition. Consequently, he made no adjustment based on any differences between the condition of the Property as compared to the other properties. I found this to be a significant omission. It was apparent to me from a comparison of the photographs of the Property with the photographs of the 22nd Street Property and the Colorado Street Property that the Property's interior was in far better condition than those two comparable properties. In particular, the Property's kitchen had modern finishes, which stood out in comparison to the condition of the kitchens in both the 22nd Street Property and the Colorado Street Property. (<u>Compare</u> Ex. Def-9 <u>with</u> Exs. Def-10 and Def-11). I find that the modern kitchen and, more generally, the relatively recent renovation of the Property significantly enhances its value in relation to the comparable properties.[8]

Second, the Property has two attractive features lacking in the comparables: central air conditioning and a rear deck.

Third, the largest downward adjustment Mr. Rader made in the Property in relation to the comparable properties was because he believed that the Property had one less bedroom and either one or one-half less bathrooms than the comparable properties. However, in his testimony, he conceded that the Property actually has two bathrooms, making it "superior" to one of the comparable properties and on par with the other two. He did not quantify the effect of the error

---

[8]  No equivalent photographs of the 1830 Shunk Street Property were available. This is unfortunate because, as the adjacent property, the 1830 Shunk Street Property is an almost ideal comparable property. In his appraisal, Mr. Rader assumed that the condition of the 1830 Shunk Street Property was "average," just as he did for the other two comparable properties. Thus, to the extent Mr. Rader undervalued the Property in relation to the other two comparables, he likely did so as well in relation to the 1830 Shunk Street Property.

regarding the additional bathroom, but it, too, contributes to my conclusion that his appraisal materially undervalued the Property.

At bottom, I find that even though the Property has one less bedroom than the comparable properties, this negative feature is more than offset by the above average "fit and finish" in the Property resulting from the Debtors' modern renovation and the two additional features the Property has described above. Considered together, these differences lead me to conclude that the Property is not worth less than the comparable properties, but rather has a value that exceeds the sales prices of the comparable properties by at least $10,000.00. As a result, I find, that the fair market value of the Property is at least $285,000.00.[9]

### VI.

For the reasons set forth above, judgment will be entered in favor of St. Edmond's and against the Debtors. An appropriate order will follow.

Date:  May 9, 2011

ERIC L. FRANK
U.S. BANKRUPTCY JUDGE

---

[9] The valuation of at least $285,000.00 is $10,000.00 greater than the two lower comparable sales prices (i.e., $275,000.00). If I consider the third comparable sales price ($280,000.00), take an average of the three comparable sales prices (i.e., $276,667.00) and add the $10,000.00 increase, the value of the Property would exceed $286,000.00.